## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Civil Action No. 3:23-cv-1608

SHANTELL FIELDS

*in her individual capacity and as Administrator of the Estate of*

LAUREN SMITH-FIELDS

*Plaintiff*

-vs-

CITY OF BRIDGEPORT

CARLA F. REMLE

JOAQUIM DEBARROS

JOSEPH MORALES

KEVIN CRONIN

ANGEL LLANOS

BUMBLE, INC.

*Defendants*

## COMPLAINT & DEMAND FOR JURY TRIAL

Plaintiff sues Defendants under 42 U.S.C. § 1983, for violation of her civil rights, discrimination based on race, and unequal treatment under the law.  She also sues Defendants for intentional and negligent infliction of emotional distress and negligence.  In support of her claims she alleges:

**INTRODUCTION**

1.      Lauren Smith-Fields was denied justice because she was black.  Indeed, she was denied a proper and thorough investigation into her death because of the color of her skin.

2.      What she got was a pseudo-death investigation riddled with negligence and/or intentional mistakes.

3.      She was denied the same treatment under the law that a white woman would have been given.

4.      She was intentionally discriminated against due to her race in violation of Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment.

5.      And she was denied these rights and privileges by the Defendants, acting under color of state law.

6.      Through this lawsuit she seeks redress for the deprivation of her federal constitutional and federal statutory rights, for the Defendants' negligence, along with their intentional or negligent infliction of emotional distress.

7.      Indeed, Title 42 of the United States Code, § 1983 provides, *inter alia*: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

8.      The Defendants are depriving the Plaintiff of her rights, privileges and immunities secured by the Constitution and laws and are liable to the injured Plaintiff in an action at law, suit in equity, and other proper proceedings for redress.

**JURISDICTION**

9.      This action under the Federal Civil Rights Act, 42 U.S.C. § 1983, seeks redress

and relief under color of state law, of rights, privileges and immunities secured to the Plaintiffs

by the Constitution of the United States, particularly, the Fourteenth amendments thereto.

10.      Under 28 U.S.C. § § 2201 and 2202, this Court, in a case of actual controversy

within its jurisdiction, may declare the rights of a plaintiff seeking such a declaration.

11.      This Court has personal and subject matter jurisdiction over the case under 28

U.S.C. § 1331 and 42 U.S.C. § 1988.

12.      This Court has supplemental jurisdiction over any other claim pursuant to 28

U.S.C. 1367(a).

**VENUE**

13.      Venue under 28 U.S.C. § 1391(b) is proper without regard to jurisdictional

amount or diversity of citizenship, in that the breach took place in this district.

**JURY DEMAND**

14.      Plaintiff respectfully demands a trial by jury on all issues in the matter pursuant to

Fed. R.Civ. P. 38(b).

**PARTIES**

15.      Plaintiff, Shantell Fields, is an individual over the age of 18.

16.      She is currently and at all times relevant herein, a citizen and resident of the State

of Connecticut.

17.      Plaintiff is the natural mother of Lauren Smith-Fields (hereinafter referred to as

"Lauren" or the "Decedent"), who died on December 12, 2021.

18.     Plaintiff is the Personal Representative and administrator of Lauren's Estate and is authorized to pursue the claims set forth herein that are taken up on her behalf.

19.     Plaintiff is suing the Defendants in her capacity as administrator of Lauren's Estate and personally as her mother.

20.     Defendant, City of Bridgeport, Connecticut (hereinafter referred to as "City") is a municipal corporation duly organized and existing under the laws of Connecticut and is located in the State of Connecticut. The City operates and controls a police department, commonly known as the Bridgeport Police Department.

21.     Defendant, Cara F. Remele, is an individual over the age of 18 and, at all times relevant herein, was employed as a police officer/detective by Defendant City. Remele was one of the officers involved in the sham death investigation. She is sued in her individual and official capacity.

22.     Defendant, Joaquim Debarros, is an individual over the age of 18 and, at all times relevant herein, was employed as a police officer/sergeant by Defendant City. Debarros was one of the officers involved in the sham death investigation. He is sued in his individual and official capacity.

23.     Defendant, Joseph Morales, is an individual over the age of 18 and, at all times relevant herein, was employed as a police officer by Defendant City. Morales was one of the officers involved in the sham death investigation. He is sued in his individual and official capacity.

24.     Defendant, Kevin Cronin, is an individual over the age of 18 and, at all times relevant herein, was employed as a police officer/detective by Defendant City. Cronin was one of the officers involved in the sham death investigation. Cronin is white. He was placed on

administrative leave for the handling of the death of the Decedent.  He is sued in his individual and official capacity.

25.     Defendant, Angel Llanos, is an individual over the age of 18 and, at all times relevant herein, was employed as a police officer by Defendant City.  Llanos was one of the officers involved in the sham death investigation.  He was placed on administrative leave for the handling of the death of the Decedent.  He is sued in his individual and official capacity.

26.     Defendant, Bumble, Inc., is a Delaware corporation with its principal place of business located at 1105 West 41st Street, Austin, Texas, 78756.

**GENERAL ALLEGATIONS**

27.     Lauren Smith-Fields was found dead in her apartment on December 12, 2021.

28.     She was twenty-three years old when she died.

29.     She was found dead after meeting up with a white man named Matthew LaFountain.  LaFountain was then thirty seven; fourteen years her elder.

30.     She met LaFountain from the dating app Bumble.

31.     She had known him for three days.

32.     On the night of December 11, 2023, at 9:30 p.m. he brought her a bottle of tequila.

33.     It was their *first* and *only* in-person meeting.

34.     On December 12, 2023, at 6:49 a.m. ⬚ approximately nine hours after they met in person ⬚ she was pronounced dead.

35.      Although the incident report states she'd been dead for at least an hour before then.

36.     A "*frantic*" LaFountain (according to the police report) confirms these facts himself.

37.     More specifically, on December 12, 2021, a "*frantic*" LaFountain told police (according to their incident report) that he first made any sort of contact with Lauren through Bumble ▯ only three days ago ▯ he sent her some cash to do her "*nails*" and traveled to her apartment with a bottle of "*tequila*" but he did not know her mobile number.

38.     When LaFountain was asked what her last name was, he explained he did not know but that her Instagram page says it is "*Smith*."

39.     There were no phone calls or cellular text messages between the two of them; only some supposed Instagram and/or Bumble direct messages.

40.     LaFountain also told police that he did not have sex with her, but a few feet away from her dead body lay a condom filled with semen and a bottle of lubricant.

41.     The police report makes no mention of whether he was ever asked if he killed her.

42.     The Defendants never arrested LaFountain.

43.     The Defendants failed to conduct a meaningful interview of LaFountain.

44.     The Defendants failed to properly investigate him or his suspicious story.

45.     The Defendants failed to consider or investigate any suspect in her death at all.

46.     Moreover, if the Defendants properly surveyed the crime scene they would have noticed several items needing to be collected for analysis, including, but not limited to a bloody sheet, a used Trojan condom with semen in it, women's undergarments, a pill on the counter, glassware used that evening to consume alcohol or other liquids, food consumed that evening, the bottle of tequila that LaFountain brought, vomit, and other biologicals.

47.     Yet the police did not bring in a crime scene investigation team the day of the incident, nor the day after the incident.

48.     In fact, the police did not bring in a CSI team until December 29, 2021, when Lauren's family demanded they do so.

49.     But by then, the evidence was compromised due to an inadequate response by the Bridgeport Police Department.

50.     Even after December 29, 2021, Bridgeport Police failed to timely submit any physical evidence collected for forensic analysis.

51.     Based upon information and belief, no physical evidence was submitted for forensic analysis before January 5, 2022.

52.     Based upon information and belief, a chain of custody issue has been intentionally and/or negligently created by the Bridgeport Police Department.

53.     The Defendants also refused to consider the numerous suspicious circumstances surrounding Lauren's death, including the bloody sheets, flipped over plate of food, state of her apartment, unknown pills or drugs at the scene, LaFountain's bottle of tequila, conflicting witness stories, Lauren's cell phone contents, or the unknown and the lack of communications between Lauren and LaFountain ⸺ the mysterious white man found in her bed with her.

54.     In fact, they didn't even detain LaFountain.

55.     And nowhere in the police report does it note that officers mention detaining LaFountain for questioning ⸺ despite him being the last person to see Lauren alive.

56.     Instead, the Police determined that he was a "*nice guy*."

57.     Even worse, the Police told Lauren's brother Lakeem Jetter that the reason they did not bring LaFountain in for questioning or detain him was because LaFountain seemed like a "*nice guy*."

58.     The police never considered why a so-called "*nice guy*" would send a woman he had never seen before, and only been in contact with for three days, cash for her nails.

59.     Had the Defendants properly investigated, they would have known Lauren's nails were already impeccable and done.

60.     Had the Defendants properly investigated, they would have known that Lauren's brother had stopped by that evening and contrary to what LaFountain had reported, Lauren was not visibly ill, drunk, or unwell, nor did she make mention of feeling ill or drinking that night.

61.     The Bridgeport Police also failed to timely collect and test key evidence, including, but not limited to, a used condom, a bloody sheet, vomit, food, the bottle of tequila LaFountain brought, cups or glassware used to consume any libations that evening, or the unknown pills believed to be a sedative.

62.     The Bridgeport Police have also failed to review the contents of her cell phone.

63.     The Bridgeport Police failed to perform a rape kit or even consider she was drugged, raped, and/or killed by the LaFountain – the last person who saw her alive.

64.     Detective Cronin also told Lauren's family on December 13, 2021, to "stop calling" and hung up the phone on them.

65.     A month later, on January 13, 2021, Lauren's mother, Shantell Fields, was told by the Bridgeport Police Department to stop calling for updates on her deceased daughter.

66.     The family was calling for updates into the investigation of Lauren's death because they weren't getting any news or information from the Bridgeport Police Department.

67.     Even to this day the Police have failed to properly update Lauren's family.

68.     The family claims this is because the investigation was a sham, and Bridgeport Police never properly investigated her death.

69.     The police even botched the death notification to Lauren's family.

70.     In fact, Lauren's family first learned of her death from Lauren's landlord when they went to her apartment after calling her for days and not getting a response. There was a note on Lauren's apartment door that read: "if you're looking for Lauren call this number."

71.     Bridgeport Police failed to properly research, track down, and notify Lauren's family and next of kin.

72.     The Police have failed to update Lauren's family from day one and continue to fail in updating her family even to this day.

73.     The Police have failed to share their investigatory findings, and failed to share any key information, reports, and lab results stemming from Lauren's death investigation.

74.     Other members of the Bridgeport Police Department have admitted that the investigation was not conducted properly and according to Department policy.

75.     More specifically, on January 30, 2022, in a press release by Mayor Ganim, he expressed his condolences to Smith-Fields family and suspended officers, *inter alia* for "failure to follow police policy."

76.     The policies, usages, practices, procedures, and rules of the City and Bridgeport Police Department included, but were not limited to, negligently and/or intentionally failing to properly investigate the death of black and African Americans and negligently and/or intentionally failing to properly and timely notify a decedent's family or next of kin of their loved one's death.

77.     In addition, the City and the Police Department engaged in a policy, custom or practice of inadequate screening, hiring, retaining, training, and supervising its employees, which was a moving force behind the violation of Plaintiff's rights as described herein.

78.     The Defendant City's lack of training for Defendants and having a de facto policy of negligently and/or intentionally failing to properly investigate the death of black and African Americans and negligently and/or intentionally failing to properly and timely notify a decedent's family or next of kin of their loved one's death is a violation of the Decedent's civil rights.

79.     Lauren lived at 33 Plymouth Street, in Bridgeport, Connecticut.

80.     Plymouth Street is located in a predominantly low income, African American and black neighborhood.

81.     Lauren is black.

82.     The Bridgeport Police Department failed to properly investigate Lauren's death and failed to properly and timely notify her family of her passing.

83.     Simply put, the Defendants intentionally conducted a pseudo death investigation into the death of Lauren Smith-Fields because she was black and failed to properly notify her loved ones of her passing because she was black.

84.     Defendants' failures were because of Lauren's race.

85.     More specifically, the Defendants' actions were motivated by an intent to discriminate based on race.

86.     Plaintiffs have been damaged because of Defendants' intentional discrimination.

**COUNT I : 42 U.S.C. § 1983**

**EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT**

*As to Defendant, City of Bridgeport, its Police Department, and Individually Named Police Officers*

87.     Plaintiff, realleges and reincorporates the allegations in paragraphs 1 through 85.

88.     The Bridgeport Police Department and individually named officers acted with deliberate indifference to the deceased's rights.

89.     American citizens, including the Plaintiff, are entitled to equal protection under the law pursuant to the Fourteenth Amendment of the U.S. Constitution.

90.     As such, police officers are required to conduct death investigations involving black and African American descendants with equal effort as death investigations involving Caucasian and/or non-black or African American descendants.

91.     Put another way, police officers are not allowed to intentionally conduct a pseudo-death investigation due to the fact that the decedent, here Lauren Smith-Fields, is blackl

92.     Indeed, the Police and municipality policy caused this constitutional tort.

93.     Here, the Police Department and individually named officers deprived the Plaintiff of a constitutional right.

94.     The right of equal protection under the law has long been recognized by courts across the United States of America, including the right of citizens not to be treated worse by police officers due to their race.

95.     Plaintiff was denied the right of equal protection under the law due to the actions and inactions of the Defendant City's Police Department and the individually named officers in conducting her death investigation.

96.     Indeed, Defendants failed to provide even the basic minimum effort of a proper death investigation with regard to the investigation of the death of the Decedent.

97.     The Police Department has a policy and custom of allowing such deprivation.

11

98.     The Defendant City and Police denied the Plaintiff equal protection under the law because Plaintiff and Decedent are both black / African American.

99.     More specifically, Defendants failed to (i) conduct a timely or meaningful investigation into Lauren's death; (ii) conduct a meaningful interview of LaFountain; (iii) follow up and/or investigate the validity of LaFountain's statements; (iv) follow up and/or investigate conflicting stories from LaFountain and Lauren's brother; (v) follow up and/or timely collect key pieces of evidence, including, but not limited to, a used condom, a bloody sheet, Lauren's cell phone, vomit, food, the bottle of tequila LaFountain brought, cups or glassware used to consume any libations that evening, and an unknown pill found in Decedent's apartment; (vi) follow up and/or investigate the suspicious circumstances surrounding Decedent's death, including the mysterious older white man found in her apartment, she never met in person before that night who gave her liquor and cash and slept in her bed.

100.     In other words, Defendants intentionally conducted a pseudo-death investigation into Lauren's death because the Decedent was black and LaFountain was white.

101.     The Bridgeport Police Department and named Defendants also failed to properly and timely notify her family of her passing.

102.     Defendants' failures were because of Lauren's race, and were motivated by an intent to discriminate, as evidenced by, inter alia, Defendant's pseudo-death investigation and that fact the Police repeatedly told Lauren's family to stop calling and inquiring with them about the investigation.

103.     The individually named Defendant police officers were acting or purporting to act in the performance of their official duties, and as such were acting under color of law.

104.    Because of the Defendants actions, Plaintiff and her family have suffered damages, including, but not limited to, pain, suffering, emotional distress, and loss of enjoyment of life.

105.    If Plaintiff prevails, she is entitled to an award of attorney's fees.

**WHEREFORE**, Plaintiff prays for judgment in her favor and against the Defendants for damages more than $30 million dollars, including actual damages and punitive damages, for the costs incurred herein and expended, for attorneys' fees under 42 U.S.C. §1988, and for such other and further relief as the Court deems just and proper.

## COUNT II: TITLE IV
## INTENTIONAL RACE DISCRIMINATION

*As to Defendant, City of Bridgeport, its Police Department, and Individually Named Police Officers*

106.    Plaintiff, realleges and reincorporates the allegations in paragraphs1 through 85.

107.    Title VI of the Civil Rights Act of 1964 states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

108.    Defendant City receives Federal financial assistance from a number of programs.

109.    Plaintiff and Decedent are both African American / black.

110.    Defendant LaFountain is also white.

111.    Defendants are required, via Title VI, to conduct death investigations involving black and African American descendants with equal efforts as death investigations involving Caucasian and/or non-African American descendants.

112.   Put another way, police officers are not allowed to intentionally conduct a pseudo-death investigation due to the fact that the decedent is black / African American.

113.   Indeed, the Police and municipality policy caused this constitutional tort.

114.   Defendants failed to provide even the basic minimum effort of a proper death investigation with regard to the investigation of the death of the Decedent.

115.   Specifically, Defendants failed to (i) conduct a timely or meaningful investigation into Lauren's death; (ii) conduct a meaningful interview of LaFountain; (iii) follow up and/or investigate the validity of LaFountain's statements; (iv) follow up and/or investigate conflicting stories from LaFountain and Lauren's brother; (v) follow up and/or timely collect key pieces of evidence, including, but not limited to, a used condom, a bloody sheet, vomit, food, the bottle of tequila LaFountain brought, cups or glassware used to consume any libations that evening, or the unknown pill found in Decedent's apartment; (vi) follow up and/or investigate the suspicious circumstances surrounding Decedent's death, including the mysterious older white man found in her apartment, she never met in person before that night who gave her liquor and cash and slept in her bed.

116.   In other words, Defendants intentionally conducted a pseudo-death investigation into Lauren's death because the Decedent was black and LaFountain was white.

117.   Defendants' failures were because of Lauren's race, and were motivated by an intent to discriminate, as evidenced by, inter alia, Defendant's pseudo-death investigation and that fact the Police repeatedly told Lauren's family to stop calling and inquiring with them about the investigation.

118.   The individually named Defendant police officers were acting or purporting to act in the performance of their official duties, and as such were acting under color of law.

119.    Because of the Defendants actions, Plaintiff and her family have suffered damages, including, but not limited to, pain, suffering, emotional distress, and loss of enjoyment of life.

120.    If Plaintiff prevails, she is entitled to an award of attorney's fees.

**WHEREFORE**, Plaintiff prays for judgment in her favor and against the Defendants for damages more than $30 million dollars, including actual damages and punitive damages, for the costs incurred herein and expended, for attorneys' fees under 42 U.S.C. §1988, and for such other and further relief as the Court deems just and proper.

<u>**COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**</u>

*As to Defendant, City of Bridgeport, its Police Department, and Individually Named Police Officers*

121.    Plaintiff, realleges and reincorporates the allegations in paragraphs 1 through 85.

122.    As more particularly set out above, the Defendants actions were intentional and/or reckless.  They either intended to cause emotional distress or knew or should have known their conduct was likely to cause such distress.

123.    The Defendants' actions were also extreme and outrageous.  Their actions were more than mere rudeness, their conduct was so outrageous as to go beyond all bounds of decency and are utterly intolerable in a civilized society.

124.    Indeed, Defendants failed to provide even the basic minimum effort of a proper death investigation with regard to the investigation of the death of the Decedent.

125.    They also failed to follow proper protocol in conducting their investigation and death notification.

126.    More specifically, Defendants failed to (i) conduct a timely or meaningful investigation into Lauren's death; (ii) conduct a meaningful interview of LaFountain; (iii) follow up and/or investigate the validity of LaFountain's statements; (iv) follow up and/or investigate

conflicting stories from LaFountain and Lauren's brother; (v) follow up and/or timely collect key pieces of evidence, including, but not limited to, a used condom, a bloody sheet, vomit, food, the bottle of tequila LaFountain brought, cups or glassware used to consume any libations that evening, Lauren's cell phone, or the unknown pill found in Decedent's apartment; (vi) follow up and/or investigate the suspicious circumstances surrounding Decedent's death, including the mysterious older white man found in her apartment, she never met in person before that night who gave her liquor and cash and slept in her bed.

127.    The Defendants' conduct was the cause of the Plaintiff's emotional distress. Indeed, it was their conduct, and not some other factor, that was and is the proximate cause for her emotional distress.

128.    The Plaintiff's emotional distress is severe. It resulted in Plaintiff's physical and/or emotional illness, and other substantial harm.

**WHEREFORE**, Plaintiff prays for judgment in her favor and against the Defendants for damages more than $30 million dollars, including actual damages and punitive damages, for the costs incurred herein and expended, for attorneys' fees, and for such other and further relief as the Court deems just and proper.

## COUNT IV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

*As to Defendant, City of Bridgeport, its Police Department, and Individually Named Police Officers*

129.    Plaintiff, realleges and reincorporates the allegations in paragraphs 1 through 85.

130.    The Defendants' conduct created an unreasonable risk of causing the Plaintiff emotional distress.

131.    Indeed, Defendants failed to provide even the basic minimum effort of a proper death investigation with regard to the investigation of the death of the Decedent.

132.     They also failed to follow proper protocol in conducting their investigation and death notification.

133.     More specifically, Defendants failed to (i) conduct a timely or meaningful investigation into Lauren's death; (ii) conduct a meaningful interview of LaFountain; (iii) follow up and/or investigate the validity of LaFountain's statements; (iv) follow up and/or investigate conflicting stories from LaFountain and Lauren's brother; (v) follow up and/or timely collect key pieces of evidence, including, but not limited to, a used condom, a bloody sheet, vomit, food, the bottle of tequila LaFountain brought, cups or glassware used to consume any libations that evening, Lauren's cell phone, or the unknown pill found in Decedent's apartment; (vi) follow up and/or investigate the suspicious circumstances surrounding Decedent's death, including the mysterious older white man found in her apartment, she never met in person before that night who gave her liquor and cash and slept in her bed.

134.     The Plaintiff's distress was foreseeable.

135.     The emotional distress was severe enough that it might result in illness or bodily harm.

136.     The Defendants' conduct was the cause of the Plaintiff's distress.

**WHEREFORE**, Plaintiff prays for judgment in her favor and against the Defendants for damages in excess of $30 million dollars, including actual damages and punitive damages, for the costs incurred herein and expended, for attorneys' fees, and for such other and further relief as the Court deems just and proper.

## COUNT V: NEGLIGENCE

*As to Defendant, City of Bridgeport, its Police Department, and Individually Named Police Officers*

137.     Plaintiff, realleges and reincorporates the allegations in paragraphs 1 through 85.

17

138.    The Defendant City's Police Department and individually named officers failed to conduct a reasonable death investigation due to their negligence.  This negligence has led to harm and damaged the Plaintiff.

139.    More specifically, the Defendant City's Police Department and individually named officers owed a duty of care to Lauren, the Plaintiff, and Lauren's family.

140.    This duty of care arises from various sources, including, but not limited to, the police department's general duty to protect public safety, various statutes, laws, rules, regulations, and department procedure and policy.

141.    Indeed, as protectors of the public, a key relationship exists between the police and the public, or in this particular case, the Plaintiff and deceased.

142.    The Defendant City's Police Department and individually named officers breached their duty of care and their duties by failing to properly investigate Lauren's death and by otherwise conducting a sham death investigation.

143.    They also failed to follow proper protocol in conducting their investigation and death notification.

144.    Indeed, Defendants failed to provide even the basic minimum effort of a proper death investigation with regard to the investigation of the death of the Decedent.

145.    More specifically, Defendants failed to (i) conduct a timely or meaningful investigation into Lauren's death; (ii) conduct a meaningful interview of LaFountain; (iii) follow up and/or investigate the validity of LaFountain's statements; (iv) follow up and/or investigate conflicting stories from LaFountain and Lauren's brother; (v) follow up and/or timely collect key pieces of evidence, including, but not limited to, a used condom, a bloody sheet, flipped over food plates, vomit, food at the scene, the bottle of tequila LaFountain brought, cups or glassware

18

used to consume any libations that evening, Lauren's cell phone, or the unknown pill found in Lauren's apartment; (vi) follow up and/or investigate the suspicious circumstances surrounding Decedent's death, including the mysterious older white man found in her apartment, she never met in person before that night who gave her liquor and cash and slept in her bed.

146.     The above cited actions and omissions deviated from the standard of care expected of a reasonable police department and police officer.

147.     The aforementioned breaches and negligence caused the Plaintiff harm, and this harm was foreseeable, including, but not limited to no person ever being arrested in Lauren's death, emotional distress and physical harm to the Plaintiff.

148.     As a direct and proximate result, Plaintiff has incurred damages due to the Defendant City's Police Department and individually named officers' actions and inactions, including, but not limited to, economic and non-economic damages for pain and suffering and emotional distress.

**WHEREFORE**, Plaintiff prays for judgment in her favor and against the Defendants for damages more than $30 million dollars, including actual damages and punitive damages, for the costs incurred herein and expended, for attorneys' fees, and for such other and further relief as the Court deems just and proper.

## COUNT VI: NEGLIGENCE

*As to Defendant, Bumble, Inc.*

149.     Plaintiff, realleges and reincorporates the allegations in paragraphs 1 through 85.

150.     Bumble Inc., owns, controls, and is involved in operating the Bumble app which is a mobile dating application with millions of users worldwide, and hundreds of thousands of users in Connecticut.

151.    Bumble conducts business within this district and the Plaintiff resides in Connecticut.

152.    Bumble markets itself as a safe and secure platform for women to connect and potentially find friends and romantic partners.

153.    However, Bumble has failed to uphold its duty of care to its users, resulting in foreseeable and preventable harm to Plaintiff.

154.    Decedent, Lauren Smith-Fields, downloaded and created an account on Bumble.

155.    Lauren carefully completed her profile, providing accurate information about herself.

156.    Bumble presented and introduced LaFountain to Lauren to be a safe potential companion for her.

157.    Lauren utilized the Bumble app in Connecticut to meet and interact with Matthew LaFountain, another Connecticut resident.

158.    Bumble has a duty of care it owned to Lauren, including, but not limited to (i) screening users; (ii) the duty to create a safe environment for its users; (iii) the duty to have policies and procedure in place to remove threats and dangerous users, screen users, the removal of harmful content like hate speech and solicitation; and the duty to secure user data and safeguard user data from unauthorized access, breaches and misuse.

159.    Bumble must also take appropriate measures to protect users from interacting with dangerous individuals.

160.    This includes screening users for potential risks, such as a history of stalking, violence, sexual assault etc.

161.    In 2021, Bumble did not run background checks on its users.

162.    In this case, Bumble failed to run a background check on its users, including
LaFountain.

163.    In 2021, Bumble did not have meaningful policies and procedures in place that
could even verify if the user was who they said they were.

164.    In 2021, the only thing that Bumble attempted to verify is an email address or a
telephone number — to verify a user was not a computer – as opposed to the person the user
claims to actually be.

165.    Indeed, in 2021, Bumble did not check a potential users license, a picture of the
potential user or person, their address, age, or any similar such information to verify who the
user is and what propensity for crime or sexual assault might exist.

166.    Bumble did not verify Matthew LaFountain

167.    Bumble did not perform a background check on Matthew LaFountain.

168.    Indeed, Bumble failed to adequately screen its users, including Matthew
LaFountain

169.    Simply put, Bumble did nothing to keep users like Lauren safe from potentially
dangers individuals or situations that might arise from using their dating app and breached the
duty of care it owned to Lauren.

170.    Here, Bumble failed to adequately screen LaFountain and allowed him to access
the platform.

171.    The above cited actions and omissions deviated from the standard of care
expected of a company like Bumble.

172.    As a direct and proximate result of Bumble's negligence, Plaintiff suffered
emotional distress and anxiety, along with economic and other non-economic damages.

173.     The breaches and negligence caused the Plaintiff and Lauren harm, and this harm was foreseeable, including Plaintiff's emotional distress and physical harm.

174.     As a direct and proximate result, Plaintiff has incurred damages due to Bumble's actions and inactions, including, but not limited to, economic and non-economic damages for pain and suffering and emotional distress.

**WHEREFORE**, Plaintiff prays for judgment in her favor and against the Defendant, Bumble, Inc., for damages more than $30 million dollars, including actual damages, restitution for any monies paid to Bumble, and prays for punitive damages, plus the costs incurred herein and expended, for attorneys' fees, and for such other and further relief as the Court deems just and proper, including an order requiring Bumble to implement effective measures to screen users, address user concerns, and prevent future harm to its users.

Respectfully submitted by:

Darnell D. Crosland, Esq.
Crosland Law Group
1200 Summer Street, Ste 202
Stamford, Connecticut 06905
Tel. (203) 921-1782
Fax (203) 921-1223

Dated: December 11, 2023