## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHANTELL FIELDS, | ) | CASE NO. 3:23-CV-01608 (KAD) |
| *in her individual capacity and as* | ) | |
| *Administrator of the Estate of Lauren* | ) | |
| *Smith-Fields*, | ) | |
|       *Plaintiff,* | ) | |
| | ) | February 20, 2025 |
|    v. | ) | |
| | ) | |
| CITY OF BRIDGEPORT, CARLA F. | ) | |
| REMELE, JOAQUIM DeBARROS, | ) | |
| JOSEPH MORALES, KEVIN CRONIN, | ) | |
| ANGEL LLANOS, BUMBLE, INC., and | ) | |
| MATTHEW LaFOUNTAIN, | ) | |
|       *Defendants.* | | |

## MEMORANDUM OF DECISION
## RE: MOTION TO DISMISS [ECF NOS. 18, 25]

Kari A. Dooley, United States District Judge:

      In December 2021, Lauren Smith-Fields ("Ms. Smith-Fields"), died unexpectedly and tragically.  Her family was not notified of her death by the Bridgeport Police Department, and the circumstances under which her family learned of her death only compounded their grief at her passing.  Plaintiff Shantell Fields ("Plaintiff"), both individually and as Administratrix for the Estate of her deceased daughter, Lauren Smith-Fields, brings this civil rights action against the City of Bridgeport (the "City"); Bridgeport police officers Det. Carla F. Remele, Sgt. Joaquim DeBarros, Officer Joseph Morales, Det. Kevin Cronin, and Officer Angel Llanos (the "Officer Defendants"); Bumble, Inc.; and Matthew LaFountain.  The Amended Complaint alleges that the City and Officer Defendants intentionally discriminated against both Plaintiff and Ms. Smith-Fields on account of their race in violation of the Equal Protection Clause of the Fourteenth Amendment, as well as Title VI of the Civil Rights Act, 42 U.S.C § 2000d, in connection with the investigation into the manner and means of Ms. Smith-Fields' death.  Plaintiff asserts several state-

law claims as well.  The City and Officer Defendants filed a motion to dismiss all counts of the Amended Complaint.  Plaintiff opposes the motion.  Deciding the instant motion does not require the Court to evaluate or opine on the conduct of the police officers alleged in the Amended Complaint, or to vindicate either party's position on the merits of the allegations.  The Court is tasked only with deciding the legal sufficiency of the claims as asserted.  For the reasons that follow, the motion to dismiss is GRANTED, subject to certain claims being permitted to be reasserted by way of a second amended complaint.

**Standard of Review**

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Id.*  Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

**Allegations and Procedural History**

The Court accepts as true the allegations in the Amended Complaint, which are summarized as follows.  Lauren Smith-Fields, an African American woman and resident of

Bridgeport, Connecticut, was found dead in her apartment on December 12, 2021.  Am. Compl., ECF No. 24, ¶¶ 28, 95.  The Amended Complaint alleges that she had met Matthew LaFountain, a white man fourteen years her senior, on the dating app Bumble three days prior.  *Id.* ¶¶ 30–32. On the night of December 11, 2021, LaFountain brought a bottle of tequila to Ms. Smith-Fields' apartment, which was their first and only in-person meeting.  *Id.* ¶¶ 33–34.  Ms. Smith-Fields' brother allegedly stopped by her apartment some time that night, and she "was not visibly ill, drunk, or unwell, nor did she make mention of feeling ill or drinking that night."  *Id.* ¶ 61. However, the following morning, a "frantic" LaFountain called the police and reported her death. *Id.* ¶¶ 37–38.  She was officially pronounced dead at 6:49 a.m. on December 12, 2021.  *Id.* ¶ 35.

The Amended Complaint alleges a plethora of flaws in the investigation conducted by the Bridgeport Police Department ("BPD"): that they failed to meaningfully interview, investigate, or arrest LaFountain or any other potential suspect, *id.* ¶¶ 42–46; that they failed to investigate or survey Ms. Smith-Fields' apartment, *id.* ¶¶ 47–50; that they failed to collect evidence at the scene, including "a bloody sheet, a used Trojan condom with semen in it, women's undergarments, a pill on the counter, glassware used that evening to consume alcohol or other liquids, food consumed that evening, the bottle of tequila that LaFountain brought, vomit, and other biologicals," *id.* ¶ 47; and that they failed to timely submit any physical evidence for forensic analysis, including by performing a rape kit, leading to multiple chain of custody issues, *id.* ¶¶ 51–53, 64.  An unidentified BPD officer allegedly told Ms. Smith-Fields' brother that they did not suspect LaFountain because he was a "nice guy."  *Id.* ¶ 58.

The Amended Complaint also alleges that the police failed to notify Plaintiff or any other family members that Ms. Smith-Fields had died.  *Id.* ¶¶ 70–73.  The BPD allegedly never contacted Plaintiff or any other family members, and Plaintiff only learned that her daughter had passed away

when they spoke with her landlord, after she had not responded to their calls for multiple days. *Id.* ¶ 71. After Plaintiff learned that Ms. Smith-Fields had died, she and other family members reached out to the BPD, but the BPD repeatedly failed to update them about the investigation. *Id.* ¶¶ 67, 73. On December 13, 2021, during a phone call with Defendant Cronin, he told family members to "stop calling" and hung up the phone on them. *Id.* ¶ 65. A month later, on January 13, 2022, Plaintiff herself was also told by an unidentified BPD officer to stop calling for updates on Ms. Smith-Fields' case. *Id.* ¶ 66. The Amended Complaint alleges that the BPD has continued to shut out Plaintiff and other family members from the investigation into Ms. Smith-Fields' death. *Id.* ¶ 73.

Plaintiff filed the Complaint on December 11, 2023.[1] The City and Officer Defendants (hereinafter the "City Defendants") filed a motion to dismiss the Complaint on May 7, 2024. ECF No. 18. Plaintiff filed the operative Amended Complaint on May 28, 2024, ECF No. 24, and the City Defendants renewed their motion to dismiss on June 25, 2024. ECF No. 25. Plaintiff asserts five causes of action against the City Defendants: a § 1983 violation of the Equal Protection Clause of the Fourteenth Amendment (Count 1); intentional race discrimination in violation of Title VI of the Civil Rights Act (Count 2); intentional infliction of emotional distress (Count 3); negligent infliction of emotional distress (Count 4); and negligence (Count 5). The City Defendants have moved to dismiss all claims against them.[2] Plaintiff opposes the motion.

---

[1] A similarly situated plaintiff brought a nearly identical complaint on the same date, which is docketed at *Washington v. City of Bridgeport*, No. 3:23-CV-1607 (KAD). The Court addresses the motion to dismiss in the *Washington* case in a separately docketed decision; however, due to the overlapping nature of the allegations, causes of action, and legal issues of both cases, these opinions draw considerably from each other.

[2] The Amended Complaint also asserts three claims against Co-Defendants Bumble, Inc. and Matthew LaFountain: negligence against Bumble (Count 6); wrongful death against LaFountain (Count 7); and intentional infliction of emotional distress against LaFountain (Count 8). The docket does not reflect that Plaintiff has served these two Defendants; regardless, neither of them have appeared in the case.

**Discussion**

### Representative Claims

As an initial matter, it is apparent on the face of the Amended Complaint that Plaintiff, in her representative capacity as Administratrix of Ms. Smith-Fields' estate, seeks to bring claims on her deceased daughter's behalf for alleged injuries or constitutional deprivations to Ms. Smith-Fields that occurred after Ms. Smith-Fields' death. There are no allegations in the Amended Complaint that Ms. Smith-Fields had any interactions with the City or the BPD that caused her any injury, constitutional or otherwise, before her death. *See* Am. Compl., ECF No. 24, ¶¶ 28–38, 43–48 (alleging that BPD only became involved after LaFountain notified them of Ms. Smith-Fields' death). In other words, Plaintiff as Administratrix only alleges posthumous injuries on Ms. Smith-Fields' behalf.

Courts that have addressed the issue have generally determined that § 1983 does not encompass claims for post-mortem injuries to a decedent. *See McCain v. Episcopal Hosp.*, 350 F. App'x 602, 604 (3d Cir. 2009) ("§ 1983 does not provide a cause of action on behalf of a deceased based upon alleged violation of the deceased's civil rights which occurred after his death." (quotations omitted)); *Soto v. City of Paterson*, No. 18-CV-11311, 2019 WL 4686809, at *3 (D.N.J. Sept. 26, 2019) (limiting plaintiff's representative § 1983 claims to violations that occurred before decedent's death) (collecting cases); *see also Hauptmann v. Wilentz*, 570 F. Supp. 351, 367 n.15 (D.N.J. 1983) ("A person's civil rights cannot be violated once that person has died; thus a cover-up of the circumstances surrounding a person's death cannot violate that person's rights."). The cases Plaintiff cites in opposition are inapposite because they all address wrongful death claims under § 1983, which involved violations of constitutional rights that necessarily took place *before* a person's death (and indeed, resulted in the person's death). *See Carringer v. Rodgers*,

331 F.3d 844, 850 n.9 (11th Cir. 2003) (discussing different circuits' theories for wrongful death recovery under § 1983).

This principle applies to Plaintiff's other claims as well.  As the Fifth Circuit has held, "[a]fter death, one is no longer a person within our constitutional *and statutory* framework, and has no rights of which he may be deprived."  *Whitehurst v. Wright*, 592 F.2d 834, 840 (5th Cir. 1979) (emphasis added).  "The argument that a corpse has no civil rights is further strengthened by the treatment of actions involving interference with dead bodies," for which many states, including Connecticut,[3] provide a cause of action, but it belongs to the *survivors* of the decedent: "If the corpse were an entity capable of possessing rights, the action would belong to him or to his personal representative."  *Id.* at 840 n.9 (collecting cases).

Therefore, because all of Plaintiff's allegations of wrongdoing against the City Defendants occurred after the decedent's death, the Court dismisses all claims asserted by Plaintiff in her representative capacity with prejudice.  *See Helmer v. Middaugh*, 191 F. Supp. 2d 283, 285 (N.D.N.Y. 2002) ("Even assuming all of the facts in the favor of the plaintiff, a dead man does not have any constitutional rights.  As the allegations . . . are limited to conduct occurring after the death of [the decedent], plaintiff's amended complaint does not allege a viable cause of action . . . ." (citation omitted)), *aff'd*, 159 F. App'x 300 (2d Cir. 2005).  The Court next addresses only the claims asserted by Plaintiff on her own behalf.

---

[3] *See Del Core v. Mohican Hist. Hous. Assocs.*, 81 Conn. App. 120, 124–25 (2004) (adopting section 868 of the Restatement (Second) of Torts and holding that Connecticut common law recognizes a cause of action for the "negligent interference with the right of a family member to control the proper burial of a deceased"); *see also Ginsberg v. Manchester Mem'l Hosp.*, No. CV-09-5030482-S, 2010 WL 796841, at *2–4 (Conn. Super. Ct. Feb. 2, 2010) (discussing cause of action for negligent interference with dead bodies).

I.    Count 1: Equal Protection Under the Fourteenth Amendment (42 U.S.C. § 1983)

Plaintiff asserts in Count 1 a violation of the Equal Protection Clause of the Fourteenth Amendment for the City Defendants' (1) failure to properly investigate Ms. Smith-Fields' death, and (2) failure to timely notify Plaintiff of her daughter's death. Am. Compl., ECF No. 24, ¶¶ 111–15, 118.

Plaintiff asserts her claims against the Officer Defendants in both their official and individual capacities. "Section 1983 claims against municipal employees sued in their official capacity are treated as claims against the municipality itself." *Seri v. Town of Newtown*, 573 F. Supp. 2d 661, 671 (D. Conn. 2008); *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007) ("An official capacity suit against a public servant is treated as one against the governmental entity itself."). "Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." *Phillips v. County of Orange*, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012) (collecting cases). Here, Plaintiff has named the City of Bridgeport as a defendant, and thus, the Court dismisses Plaintiff's claims against the Officer Defendants in their official capacities as redundant. *See Salaman v. City of New Haven*, No. 3:23-CV-639, 2023 WL 4931934, at *2–3 (D. Conn. Aug. 2, 2023). The Court addresses only the claims asserted against the Officer Defendants in their individual capacities below.

A.    The Municipality

The City Defendants argue that Plaintiff has failed to adequately plead that the City violated her civil rights under the framework for asserting such claims set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Mot. to Dismiss, ECF No. 18-1, at 13–16. The Court agrees.

"Section 1983[4] gives a cause of action to any person who has been deprived of his constitutional rights, privileges or immunities under color of state law." *Powell v. Workmen's Comp. Bd. of State of N.Y.*, 327 F.2d 131, 135 (2d Cir. 1964). The Fourteenth Amendment to the U.S. Constitution declares that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc*., 473 U.S. 432, 439 (1985). To state a claim under the Equal Protection Clause under a race-based theory, the plaintiff must allege that a government actor intentionally discriminated against her on the basis of her race. *Brown v. City of Oneonta*, 221 F.3d 329, 336–37 (2d Cir. 2000); *see Gant ex rel. Gant v. Wallingford Bd. of Educ*., 195 F.3d 134, 141 (2d Cir. 1999) ("The ultimate inquiry, of course, is one of discriminatory purpose on the part of the defendant himself. Thus, to establish a violation of the Equal Protection Clause . . ., a plaintiff must show that . . . the defendant intended the discrimination to occur."). "Discriminatory purpose 'implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" *Hayden v. County of Nassau*, 180 F.3d 42, 50 (2d Cir. 1999) (citing *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979)). "[C]laims of race-based discrimination under the Equal Protection Clause . . . require that intentional discrimination be alleged in a non-conclusory fashion." *Clyburn v. Shields*, 33 F. App'x 552, 555 (2d Cir. 2002) (citing *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982)).

---

[4] Section 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ." 42 U.S.C. § 1983.

In *Monell*, the Supreme Court determined that "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."   436 U.S. at 690. "Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 124–25 (2d Cir. 2004) (emphasis added).

Significant here, a "municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under [§ 1983] on a *respondeat superior* theory." *Monell*, 436 U.S. at 691 (emphasis in original).  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [§ 1983]." *Id*. at 694.  When a plaintiff relies upon a city employee's single tortious decision, the court's inquiry focuses on whether the "actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Amnesty Am.*, 361 F.3d at 126.  Such an action provides a basis for municipal liability where it is "taken by, or is attributable to, one of the city's authorized policymakers." *Id*.  In other words, "municipal liability under [§ 1983] attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122–23 (1988) ("[G]overnments should be held responsible when, and only when, their official policies

cause their employees to violate another person's constitutional rights."). Finally, a municipal policy cannot generally be gleaned from a single incident. *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy[.]").

Some courts have identified four ways that a plaintiff may demonstrate a government "policy or custom": "[B]y alleging the existence of (1) a formal policy; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policymakers; or (4) a failure to properly train or supervise municipal employees that amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact." *Gomez v. City of Norwalk*, No. 3:15-CV-1434 (MPS), 2017 WL 3033322, at *3 (D. Conn. July 17, 2017) (quotations omitted).

Here, Plaintiff's allegations as to the City's policy or custom of intentional discrimination are wholly conclusory. Indeed, the Amended Complaint asserts in summary fashion that "[t]he Police Department has a policy and custom of allowing such deprivation." Am. Compl., ECF No. 24, ¶ 113. But a "[p]laintiff cannot merely allege the existence of a municipal policy or custom . . . [she] must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012) (quotation omitted) (collecting cases). The Amended Complaint does make one reference to another African American woman, Brenda Lee Rawls, whose death was investigated by the BPD, but Plaintiff does not provide any details about Ms. Rawls' death or the investigation thereof, including when and how she died, or the names of the BPD officers involved in the

investigation.[5]  The allegations as to Ms. Rawls are equally conclusory and provide no factual support for Plaintiff's claims.  *See* Am. Compl., ECF No. 24, ¶ 89 ("Brenda Lee Rawls, for example, another black individual [from] Bridgeport, was also discriminated against based on race and treated differently under the law due to the color of her skin.").  Such allegations are insufficient when they "rely on only isolated incidents or conclusory language."  *Wozar*, 2025 WL 227645, at *14.

Because Plaintiff has not alleged a pattern of Bridgeport police failing to investigate the deaths of African American women and/or failing to notify their families, it is more difficult for Plaintiff to successfully make out a *Monell* claim.  *See Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008) ("[A] custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality].").  As discussed above, when a plaintiff relies upon a city employee's single tortious decision to show a policy or custom of discrimination, the court's inquiry focuses on whether the "actions of the employee in question may be said to represent the conscious choices of the municipality itself."  *See Amnesty Am.*, 361 F.3d at 126.  Where, as here, a plaintiff attributes the constitutional deprivation to a lower-level municipal employee, then she must plausibly allege that a higher-ranking official at the policy-making level either ratified or approved of the subordinate's actions.  *See id.*  But Plaintiff does not allege any instances where higher-ranking City officials adopted or approved of the decisions of the Officer Defendants.  To the contrary, Plaintiff includes in her allegations the

---

[5] Ms. Rawls' death forms the basis for the complaint in the related case, *Washington v. City of Bridgeport*, No. 3:23-CV-1607 (KAD).  *See supra* at n.1.  Even if the Court were to incorporate the complaint from *Washington* by reference, or analyze the two complaints in conjunction with each other, it would not be sufficient to allege a policy or custom under the *Monell* framework.  *See Wozar v. Campbell*, No. 3:24-CV-851 (VDO), 2025 WL 227645, at *14 (D. Conn. Jan. 17, 2025) ("Though a plaintiff is not required to identify a set number of incidents to plausibly show a practice 'of municipal officials . . . so persistent or widespread as to constitute a custom or usage with the force of law,' a plaintiff cannot rely only on isolated incidents or conclusory language." (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015))).

issuance of a press release by the mayor of Bridgeport about the investigation on January 30, 2022, in which the mayor announced the suspension of two of the investigating officers for their "failure to follow police policy."  Am. Compl., ECF No. 24, ¶ 76.  These allegations weigh against an inference that the City had a policy or custom of discriminating against the families of African American women in death investigations as alleged.[6]

Plaintiff's attempt to make out a *Monell* claim through a failure-to-train theory fares no better.  To successfully allege a failure to train, the plaintiff must establish "not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that there was a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation."  *Amnesty Am.*, 361 F.3d at 129 (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)).  Plaintiff has provided no allegations of the City's training programs, nor has she "advanced any theory as to how a training deficiency caused" the inadequate investigation into Ms. Smith-Fields' death or the failure to notify Plaintiff of Ms. Smith-Fields' death.  *See id.* at 130.  And all of Plaintiff's allegations regarding the City's failure to train are similarly conclusory.  *See, e.g.*, Am. Compl., ECF No. 24, ¶¶ 78, 92–94 ("[T]he City and the Police Department engaged in a policy, custom or practice of inadequate screening, hiring, retaining, training and supervising its employees, which was a moving force behind the violation of Plaintiff's rights . . . .").

---

[6] Plaintiff's opposition purports to identify parts of the Amended Complaint that adequately allege a policy or custom; but the excerpts she includes are archetypical of conclusory allegations that cannot sustain a claim under Rule 12(b)(6).  *See* Am. Compl., ECF No. 24, ¶ 81 ("[T]he City and its agents have a pattern, practice, and unwritten policy to not investigate the death of African American and black individuals the same as white individuals."); *id.* ¶ 79 ("Defendant City[] . . . ha[s] a de facto policy of negligently and/or intentionally failing to properly investigate the death of black and African Americans and negligently and/or intentionally failing to properly and timely notify a decedent's family or next of kin . . . .").

Thus, Plaintiff's *Monell* claim against the City is dismissed for failure to plausibly state a claim. This dismissal is without prejudice, and the Court grants Plaintiff leave to amend if she believes there are specific facts that could be alleged to adequately plead *Monell* liability.

B.  The Officer Defendants—Individual Capacity

Plaintiff also asserts § 1983 claims for violations of the Equal Protection Clause by the Officer Defendants in their individual capacity. These claims largely fail for the same reason her *Monell* claim fails: the Amended Complaint is replete with only conclusory allegations as to the Officer Defendants' discriminatory intent. *E.g.*, Am. Compl., ECF No. 24, ¶ 98 ("The Bridgeport Police Department failed to properly investigate Lauren's death and failed to properly and timely notify the Plaintiff and her family of her passing because of the color of her skin and because her family is black."); *id.* ¶ 118 ("Defendants' failures were because of Lauren's race and Plaintiff's race, and were motivated by an intent to discriminate, as evidenced by, *inter alia*, Defendant's pseudo-death investigation . . . ."); *see Gainey v. Pagel*, No. 3:21-CV-43 (SRU), 2021 WL 2400256, at * (D. Conn. June 11, 2021) (dismissing equal protection claim where plaintiff only provided conclusory allegation that defendants' actions were "racially motivated").

Further, the Amended Complaint generally fails to differentiate between the Officer Defendants in its attribution of allegedly discriminatory conduct. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation omitted). The Second Circuit has defined "personal involvement" to mean direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (citation omitted). The

Amended Complaint consistently refers to the Officer Defendants collectively and does not attribute any specific actions or instances of discriminatory conduct to any of them individually. *See Williams v. Novoa*, No. 19-CV-11545, 2022 WL 161479, at *10 (S.D.N.Y. Jan. 18, 2022) (noting that "group pleading[s]" are "impermissible" for § 1983 claims). For instance, Defendants Remele, DeBarros, Morales, and Llanos each appear only *once* in the entire Amended Complaint, in the section identifying the parties. *See* Am. Compl., ECF No. 24, ¶¶ 21–23, 25. They are each only described as "one of the officers involved in the sham death investigation," and no other action or conduct is attributed to any of them. *Id.* This is plainly insufficient to state a § 1983 claim as "[t]here are no allegations of any personal, individual actions taken by any individual defendant." *Harry v. McDonald*, No. 3:21-CV-1355 (SALM), 2022 WL 3576676, at *4 (D. Conn. Aug. 19, 2022) (Merriam, J.).

For this reason, the Amended Complaint also fails to satisfy Rule 8 of the Federal Rules of Civil Procedure, which requires that each defendant be given "fair notice of what the plaintiff's claim is and the ground upon which it rests." *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (quotations omitted). But a complaint does not satisfy Rule 8 "[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct." *Id.*

As for Defendant Cronin, the Amended Complaint alleges that he was one of the officers placed on administrative leave for his handling of the investigation into Ms. Smith-Fields' death. Am. Compl., ECF No. 24, ¶ 24. It also alleges that during a phone call with the decedent's family on December 13, 2021, Defendant Cronin told them to "stop calling" and hung up the phone on them. *Id.* ¶ 65. These are the only two factual allegations attributed to Defendant Cronin specifically. And neither of these allegations, without more, allows the Court to draw an inference that his actions were motivated by racial animus. *See Marrone v. Plainview-Old Bethpage Sch.*

*Dist.*, No. 22-CV-1519, 2024 WL 4252042, at *6 (E.D.N.Y. Sept. 20, 2024) (dismissing complaint where race or national origin did not play a role in interactions between plaintiff and defendant).

Plaintiff's claims under § 1983 against the Officer Defendants are therefore dismissed for failure to plausibly state a claim. The dismissal is without prejudice, and the Court grants Plaintiff leave to amend if she believes there are sufficient factual allegations which would cure the deficiencies identified herein.

II.    <u>Count 2: Title VI Race Discrimination</u>

Plaintiff next asserts violations of Title VI of the Civil Rights Act, 42 U.S.C § 2000d, against the City and BPD, as a recipient of federal funds, as well as against the Officer Defendants. As an initial matter, Plaintiff's Title VI claims against the Officer Defendants must be dismissed with prejudice because Title VI does not provide for individual or personal liability: only institutions or organizations that receive federal funding may be held liable under Title VI. *See Idlibi v. Conn. Dep't of Pub. Health* ("*Idlibi II*"), No. 3:23-CV-353 (JAM), 2024 WL 920728, at *6 (D. Conn. Mar. 4, 2024) ("As an initial matter, a Title VI claim may proceed solely against the entity who receives federal funding and not against individual defendants."), *aff'd*, No. 24-720, 2024 WL 4645698 (2d Cir. Nov. 1, 2024); *Bossie v. Houle*, No. 3:10-CV-879 (JBA), 2011 WL 4435699, at *2 (D. Conn. Sept. 23, 2011) (collecting cases). Thus, the Court only analyzes Plaintiff's Title VI claims as asserted against the City.

Title VI[7] "prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012). The statute only prohibits intentional discrimination. *Id.*; *see also Alexander v. Sandoval*, 532 U.S.

---

[7] Title VI provides in full: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

275, 280 (2001) ("[I]t is similarly beyond dispute . . . that [42 U.S.C. § 2000d] prohibits only intentional discrimination."). Consequently, "[a] substantive violation of Title VI occurs when '(1) . . . there is racial or [other prohibited] discrimination and (2) the entity engaging in discrimination is receiving federal financial assistance.'" *Rafi v. Yale Univ. Sch. of Med.*, No. 3:14-CV-1582 (VAB), 2017 WL 3205548, at *11 (D. Conn. July 27, 2017) (quoting *Baker v. Bd. of Regents*, 991 F.2d 628, 631 (10th Cir. 1993)); *see also Karlen ex rel. J.K. v. Westport Bd. of Educ.*, 638 F. Supp. 2d 293, 300 (D. Conn. 2009). "To plead a sufficient discrimination claim under Title VI, a plaintiff need only give plausible support to a minimal inference of discriminatory motivation." *Bhatnagar v. Parsons Sch. of Design at the New Sch.*, No. 20-CV-2321 (LGS), 2021 WL 2333243, at *2 (S.D.N.Y. June 8, 2021) (quotations omitted); *see Ikedilo v. Statter*, No. 19-CV-9967, 2020 WL 5849049, at *8 (S.D.N.Y. Sept. 30, 2020) (citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015)).

"In certain circumstances, courts view actions of a third party as intentional violations by the funding recipient itself." *Zeno*, 702 F.3d at 664 (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999)). For instance, in the educational setting, public school districts may be exposed to liability under Title VI for the discriminatory actions of teachers or students, if the school district is found to have been "deliberately indifferent" to that discriminatory harassment. *See id.* at 665 (collecting cases). A plaintiff may plead deliberate indifference on the part of a Title VI funding recipient if they establish: (1) "substantial control" of the funding recipient over the third party, (2) "severe, pervasive, and objectively offensive" conduct that is discriminatory in effect, (3) actual knowledge by the funding recipient's decisionmakers, and (4) "deliberate indifference" to the discriminatory harassment in the recipient's response. *See id.* (citing *Davis*, 526 U.S. at 643–50).

Against these requirements, it is manifest that Plaintiff's conclusory allegations do not plausibly state a claim for intentional discrimination under Title VI against the City. Without any supporting factual allegations, the Plaintiff alleges "Defendants' failures were because of Lauren's race," and "Defendants intentionally conducted a pseudo-death investigation into Lauren's death because the Decedent was black and LaFountain was white." Am. Compl., ECF No. 24, ¶¶ 100, 116. "Title VI . . . require[s] that intentional discrimination be alleged in a non-conclusory fashion," *Clyburn*, 33 F. App'x at 555; these allegations are insufficient to clear that hurdle. *See Idlibi v. New Britain Jud. Dist.* ("*Idlibi I*"), No. 3:22-CV-1374 (JAM), 2023 WL 6216810, at *4 (D. Conn. Sept. 25, 2023) (dismissing Title VI claim where plaintiff failed to allege non-conclusory facts to support his claim of intentional discrimination). And while Plaintiff does include allegations of a factual, non-conclusory nature, they do not, of themselves, allow for an inference that the City's conduct, through the employee officers, was motivated by a discriminatory intent. For example, Plaintiff alleges that the BPD failed to "conduct a timely or meaningful investigation into Lauren's death," by failing to interview and follow up with LaFountain, and by failing to timely collect "key pieces of evidence, including, but not limited to, a used condom, a bloody sheet, vomit, food, the bottle of tequila LaFountain brought, cups or glassware used to consume any libations that evening, or the unknown pill found in Decedent's apartment." Am. Compl., ECF No. 24, ¶ 131. It may very well be the case that the City Defendants negligently—or even incompetently or intentionally—failed to adequately investigate Ms. Smith-Fields' death, but Plaintiff has provided no non-conclusory allegations from which to infer that these failures were on account of Ms. Smith-Fields' race. For instance, Plaintiff has not included allegations that would provide direct evidence of discrimination, such as racially discriminatory comments made by the Bridgeport police officers. Nor does she allege that families of non-Black

decedents were afforded timely notification of the decedent's death and a better and more thorough investigation. *See Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022) ("[D]iscriminatory intent can be shown by either direct evidence of discriminatory animus or circumstantial evidence of such animus, including by showing disparate treatment among similarly situated [persons]." (applying Title VII[8])); *e.g.*, *Shore v. Mirabilio*, No. 3:16-CV-2078 (VLB), 2019 WL 13293059, at *8 (D. Conn. Mar. 8, 2019) (dismissing Title VI claim where plaintiff alleged adverse action taken against her but "the facts pleaded do not support the inference that [defendant] was biased"); *Idlibi II*, 2024 WL 920728, at *6 (dismissing Title VI claim where plaintiff "has not alleged any non-vague or non-conclusory facts to suggest that the [defendant] took any adverse action against him because of his national origin or religion").

Absent sufficient factual allegations from which a discriminatory intent on the part of the officers may be inferred, it is a foregone conclusion that the additional requisites for imputing liability to the City—*i.e.*, knowledge of the discrimination and deliberate indifference thereto—cannot be met. Plaintiff's Title VI claims against the Officer Defendants are dismissed with prejudice. Plaintiff's Title VI claim against the City is dismissed without prejudice, and the Court grants leave to amend if Plaintiff believes there are additional facts which could be pled to satisfy the elements of this claim as identified above.[9]

---

[8] Courts have long interpreted the substantive discrimination provisions in Title VI, Title VII, and Title IX in tandem with one another. *See Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102–03 (2d Cir. 2022) (summarizing framework under these provisions); *Othon v. Wesleyan Univ.*, 612 F. Supp. 3d 35, 48 (D. Conn. 2020); *see also Zeno*, 702 F.3d at 665 n.9 ("Historically, the Supreme Court has applied parallel analyses to claims brought under Title IX and Title VI.").

[9] The Court has not discussed the adequacy of the allegations on the issues of whether the City had "substantial control" over the third-party officers or whether the discriminatory conduct was "severe, pervasive, and objectively offensive," but any Amended Complaint would be required to sufficiently support these elements as well.

III.    <u>Count 3: Intentional Infliction of Emotional Distress</u>

Plaintiff brings a common-law claim for intentional infliction of emotional distress ("IIED") against the City Defendants. However, Plaintiff has failed to plead adequate facts to establish an IIED claim under Connecticut law.[10] In Connecticut, to state a claim of intentional infliction of emotional distress, Plaintiff must allege: (1) that Defendant intended to inflict emotional distress or knew or should have known that such distress was a likely result of their conduct; (2) that the conduct was extreme and outrageous; (3) that Defendant's conduct was the cause of Plaintiff's distress; and (4) that the emotional distress sustained by the Plaintiff was severe. *See Appleton v. Bd. of Educ.*, 254 Conn. 205, 210 (2000) (quoting *Petyan v. Ellis*, 200 Conn. 243, 253 (1986)). Extreme and outrageous conduct is defined as conduct that "exceeds all bounds usually tolerated by decent society." *Crocco v. Advance Stores Co.*, 421 F. Supp. 2d 485, 503 (D. Conn. 2006) (quoting *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 443 (2003)). Whether "conduct is sufficient to satisfy the element of extreme and outrageous conduct is a question, in the first instance, for the court." *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 194 (D. Conn. 2000) (quoting *Johnson v. Chesebrough-Pond's USA Co.*, 918 F. Supp. 543, 552 (D. Conn. 1996)).

While there is little question that the allegations speak very poorly of the Bridgeport police officers involved in the investigation of Ms. Smith-Fields' death, Plaintiff's allegations regarding the City Defendants' conduct simply do not reach the threshold level of conscience-shocking

---

[10] Although neither party addressed the issue in their briefing, Connecticut law is clear with regard to municipal liability for the intentional torts of its employees. Section 52-557n(a)(2)(A) excludes from municipal liability "[a]cts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct." Conn. Gen. Stat. § 52-557n(a)(2)(A). "[A] municipality cannot be held liable for the intentional conduct of its employees under Conn. Gen. Stat. § 52–557n." *Milardo v. City of Middletown*, No. 3:06-CV-1071 (DJS), 2009 WL 801614, at *10 (D. Conn. Mar. 25, 2009). Thus, although not argued, it appears that the City would be statutorily immune from Plaintiff's IIED claim.

conduct.[11]  The allegations in the Amended Complaint—that BPD officers "failed to provide even the basic minimum effort of a proper death investigation" for Ms. Smith-Fields; that they failed to notify Plaintiff of Ms. Smith-Fields' death; and that Defendant Cronin hung up on Ms. Smith-Fields' family members and told them to stop calling, Am. Compl., ECF No. 24, ¶¶ 65, 140–42— individually and in the aggregate are not "extreme and outrageous" and do not "exceed all bounds usually tolerated by decent society."  Again, these allegations, if proven, would speak poorly of the professionalism and competence of these officers, but they do not so "shock the conscience" as to constitute intentional infliction of emotional distress.  *See, e.g.*, *Carone v. Mascolo*, No. 3:06-CV-1094 (DJS), 2007 WL 2318818, at *5 (D. Conn. Aug. 14, 2007); *Doe v. Town of Greenwich*, 422 F. Supp. 3d 528, 545 (D. Conn. 2019).

The City Defendants' motion to dismiss the intentional infliction of emotional distress claim is granted.  Count 3 is dismissed with prejudice.

### IV.    Counts 4 and 5: Negligent Infliction of Emotional Distress and Negligence

Lastly, Plaintiff brings two claims for negligent infliction of emotional distress (NIED) and negligence against all City Defendants.  As a threshold matter, the Court agrees with the City Defendants that Count 5 (negligence) is duplicative of Count 4 (NIED), and Count 5 must therefore be dismissed.  "Duplicative claims shall be dismissed when they are based on identical conduct and seek the same relief."  *Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Oregon, Inc.*, 156 F. Supp. 3d 348, 362 (E.D.N.Y. 2016) (collecting cases).  The basis for Plaintiff's NIED claim is that the City Defendants failed to conduct a proper death investigation and failed to properly notify Plaintiff of Ms. Smith-Fields' death, that the City Defendants had a duty to Plaintiff to do so, and that the City Defendants' negligent failure to do so resulted in emotional distress to

---

[11] The Amended Complaint also continues to lump the City Defendants together in Count 3.  For the reasons discussed above, *supra* at p. 14, this would be an alternative basis upon which to dismiss Count 3.

Plaintiff. *See* Am. Compl., ECF No. 24, ¶¶ 147–52. Plaintiff makes the exact same allegations—sometimes with verbatim language—in supporting her claim for negligence. *See id.* ¶¶ 154–64. The only substantive difference between these two counts is a conclusory allegation in Count 5 that the City Defendants' actions caused her physical harm, with no elaboration or specifics as to the nature of that physical harm. *See id.* ¶ 163. There are no factual allegations of misfeasance beyond those asserted in the NIED claim. *See Donald Dean & Sons, Inc. v. Xonitek Sys. Corp.*, 656 F. Supp. 2d 314, 323 n.12 (N.D.N.Y. 2009). The Court therefore grants the City Defendants' motion to dismiss Count 5 of the Amended Complaint as duplicative of Count 4 and considers Plaintiff's allegations of negligence in connection with her NIED claim below.

"A municipality's potential liability for its tortious acts is limited by the common law principle of governmental immunity . . . . Governmental immunity, however, is not a blanket protection for all official acts." *Heigl v. Bd. of Educ.*, 218 Conn. 1, 4 (1991). "[A] municipality is immune from liability for the performance of governmental acts as distinguished from ministerial acts . . . . Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature . . . [M]inisterial acts are performed in a prescribed manner without the exercise of judgment or discretion . . . ." *Elliott v. City of Waterbury*, 245 Conn. 385, 411 (1998) (citations and internal quotations omitted). "Municipal officials are immune from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society. Discretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing

liability for that injury.  In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion.  This is because society has no analogous interest in permitting municipal officers to exercise judgment in the performance of ministerial acts." *Doe v. Petersen*, 279 Conn. 607, 614–15 (2006) (internal quotations and citations omitted).

Conn. Gen. Stat. § 52-557n codifies, in part, these common-law principles of governmental immunity for municipalities, and it limits a municipality's liability for its tortious acts or the tortious acts of its employees consistent with these principles.  *See Elliott*, 245 Conn. at 407–08. Specifically, Conn. Gen. Stat. § 52-557n provides for the liability of municipalities for the "negligent acts or omissions of such political subdivision or any employee," except for acts or omissions "which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law."  Conn. Gen. Stat. § 52-557n.  Accordingly, to ascertain whether governmental immunity applies to the Plaintiff's negligence claims, the Court must determine whether the City's, or its officers', alleged acts or omissions were discretionary or ministerial in nature.  *See Gordon v. Bridgeport Hous. Auth.*, 208 Conn. 161, 166–70 (1988). When a municipal employee's actions are discretionary in nature, governmental immunity attaches unless one of three exceptions apply.

Plaintiff does not address the issue of whether a police officer's acts of investigating a person's death or notifying their next of kin are discretionary or ministerial, but it is clear to this Court that the manner and means of an officer's investigation of a death involves discretionary acts.  *See Ancona v. Samsel*, No. 3:16-CV-172 (MPS), 2017 WL 4765641, at *8 (D. Conn. Oct. 20, 2017); *Ventura v. Town of East Haven*, 170 Conn. App. 388, 405 n.18 (2017) ("Paramount to an officer's discretion is the ability to determine how to pursue an investigation . . . ."), *aff'd*, 330

Conn. 613 (2019); *see also Gordon*, 208 Conn. at 179 ("[T]he great weight of authority [holds] that the operation of a police department is a discretionary governmental function.").

Regarding a police officer's duty to notify next of kin, prior to the passage of Conn. Gen. Stat. § 7-294mm (which requires police to notify next of kin within 24 hours, and became effective on October 1, 2022), there is little case law on whether such a common-law duty exists in Connecticut, let alone whether it is discretionary or ministerial. Notwithstanding, determining whether a duty is discretionary or ministerial is a question of law for the court; to establish that a duty is ministerial, the plaintiff must "point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion." *Ventura*, 330 Conn. at 631 (quotations omitted). Plaintiff alleges that the BPD's failure to notify her "was not conducted properly and according to Department policy," Am. Compl., ECF No. 24, ¶ 75, but she does not identify any specific policy or rule of the BPD that the officers allegedly violated. Indeed, Plaintiff advances no argument that next-of-kin notification is ministerial in nature. Further, the two trial court decisions that the Court has identified both held that a police officer's act of notifying next of kin was discretionary. *Fanfarelli v. City of West Haven*, No. NNH-CV-99-0430429-S, 2002 WL 316623444, at *5 (Conn. Super. Ct. Nov. 7, 2002) ("There is no evidence in this case that a duty to notify the next of kin, if it exists, is to be performed in a prescribed manner without the exercise of judgment or discretion. Therefore, any duty, on the part of the defendants to notify the plaintiffs would fall under the rubric of discretionary acts."); *Est. of Gadway ex rel. Gadway v. City of Norwich*, No. KNL-CV-05-4003307-S, 2008 WL 5220566, at *7 (Conn. Super. Ct. Nov. 14, 2008) ("In the present case, the alleged duties of Norwich may be considered discretionary in nature when there was no established policy or procedure in the

23

Norwich Police Department for notification of the next-of-kin."). Thus, in the absence of allegations which identify a specific policy which clearly prescribes the manner or timing of next-of-kin notification, and allegations that officers failed to act in accordance with those prescribed procedures, the Plaintiff's claims are subject to dismissal on the basis of governmental immunity.

Plaintiff's claim therefore fails unless she can establish an exception to the application of governmental immunity. There are three exceptions to governmental immunity, each of which "represents a situation in which the public official's duty to act is [so] clear and unequivocal that the policy rationale underlying discretionary act immunity—to encourage municipal officers to exercise judgment—has no force." *Odom v. Matteo*, No. 3:08-CV-1569 (VLB), 2010 WL 466000, at *5 (D. Conn. Feb. 3, 2010) (quoting *Petersen*, 279 Conn. at 615). First, liability may be imposed for a discretionary act when the alleged conduct involves malice, wantonness or intent to injure; second, liability may be imposed for a discretionary act when a statute provides for a cause of action against a municipality or municipal official for failure to enforce certain laws; and third, liability may be imposed when the circumstances make it apparent to the public officer that his or her failure to act would likely subject an identifiable person to imminent harm. *See Roguz v. Walsh*, No. 09-CV-1052 (TLM), 2012 WL 6049580, at *8 (D. Conn. Dec. 5, 2012).

Only the third exception is at issue with respect to this NIED claim. The identifiable person-imminent harm exception has three requirements: "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm . . . . All three must be proven in order for the exception to apply." *Haynes v. City of Middletown*, 314 Conn. 303, 313 (2014) (internal citations omitted). An imminent harm is one that has a significant and foreseeable risk of occurring. *Purzycki v. Town of Fairfield*, 244 Conn. 101, 110 (1998). "[W]hether a particular plaintiff comes within a cognizable

class of foreseeable victims for purposes of this narrowly drawn exception to qualified immunity ultimately is a question of law for the courts, in that it is in effect a question of whether to impose a duty of care . . . .   In delineating the scope of a foreseeable class of victims exception to governmental immunity, our courts have considered numerous criteria, including the imminency of any potential harm, the likelihood that harm will result from a failure to act with reasonable care, and the identifiability of the particular victim." *Grady v. Town of Somers*, 294 Conn. 324, 351 (2009). The scope of this foreseeable class of victims is narrow. *Dipane-Saleem v. Gallagher*, No. 3:15-CV-596 (MPS), 2016 WL 1060190, at *8 (D. Conn. Mar. 15, 2016).

The Court agrees with the City Defendants that the identifiable person-imminent harm exception is not implicated by the Plaintiff's allegations. First, Plaintiff has not alleged that the City Defendants' conduct subjected her (or anyone else) to imminent harm. It is not enough that the alleged harm may be foreseeable: "Imminent does not simply mean a foreseeable event at some unspecified point in the not too distant future. Rather, we have required plaintiffs to identify a discrete place and time period at which the harm will occur." *Bonington v. Town of Westport*, 297 Conn. 297, 314 (2010), *abrogated on other grounds*, *Ventura*, 330 Conn. 613 (2019). The Amended Complaint neither identifies a discrete place or time that harm would take place as a result of the alleged negligently undertaken investigation. Nor does it allege that the BPD had a "specific awareness" of the imminent harm at issue. *See id.* at 314.

On this issue, courts in this state consistently reject the application of the exception to NIED claims.

> "[N]onphysical harm is 'not the type of 'dangerous condition' that rises to a level so as to invoke the imminent harm to identifiable victim exception." *See Borg v. Town of Westport*, No. 3:15-cv-1380 (AWT), 2016 U.S. Dist. LEXIS 109841, 2016 WL 9001021, at *10 (D. Conn. Aug. 18, 2016); *Bento v. City of Milford*, No. 3:13-cv-1385, 2014 U.S. Dist. LEXIS 59079, 2014 WL 1690390, at *6 (D. Conn. Apr. 29, 2014) ("[C]ourts in this state have also held that the imminent harm complained

of must be physical in nature in order for the exception to apply."); *Pane v. City of Danbury*, No. CV97347235S, 2002 Conn. Super. LEXIS 3360, 2002 WL 31466332, at *9 (Conn. Super. Ct. Oct. 18, 2002), *aff'd*, 267 Conn. 669, 841 A.2d 684 (2004) (Finding that "[c]ases where plaintiffs allege 'imminent harm' typically involve physical harm rather than emotional distress[,]" therefore finding governmental immunity for the plaintiff's negligent infliction of emotional distress claim).

*Chase v. Nodine's Smokehouse, Inc.*, 360 F. Supp. 3d 98, 121 (D. Conn. 2019). While it is certainly foreseeable that a decedent will have a next of kin, and that the next of kin will experience emotional distress at learning of the decedent's passing, this does not equate with the requisite "specific awareness" that the timing of next-of-kin notification or that the specific investigative steps undertaken by the officers will result in harm to the Plaintiff in the form of emotional distress.

Plaintiff has not pleaded facts sufficient to invoke the exceedingly narrow identifiable person-imminent harm exception, and accordingly, as discussed above, governmental immunity bars Plaintiff's NIED claims. The City Defendants' motion to dismiss Plaintiff's negligent infliction of emotional distress claim is granted. Count 4 is dismissed with prejudice.

**Conclusion**

As explained above, the City Defendants' motion to dismiss is GRANTED in its entirety. All of Plaintiff's claims in her representative capacity against the City Defendants are dismissed with prejudice. In her individual capacity, Counts 1 and 2 are dismissed without prejudice to the filing of a second amended complaint. Also in her individual capacity, Counts 3, 4, and 5 are dismissed with prejudice. Any second amended complaint shall be filed on or before March 24, 2025. If no second amended complaint is filed, this case will be closed on March 25, 2025.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of February, 2025.

  */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE